**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH & GINA HABER,** | : | |
| *individually and on behalf of all others* | : | |
| *similarly situated*, | : | **CIVIL ACTION** |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BANK OF AMERICA, N.A., and** | : | |
| **REDC DEFAULT SOLUTIONS,** | : | **No. 14-0169** |
| *Defendants*. | : | |

**M E M O R A N D U M   O P I N I O N**

PRATTER, J.                                                    JUNE 27, 2014

This action arises from the communications between Bank of America ("BOA") and

REDC Default Solutions ("REDC"), on the one hand, and Joseph and Gina Haber, on the other,

regarding the Habers' mortgage.

The Habers, individually and on behalf of putative class members, sued BOA and REDC

for alleged violations of the Fair Credit Reporting Act ("FRCA"), 15 U.S.C. § 1681 *et seq.*, and

the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* The Habers claim

that BOA and REDC violated the FCRA by pulling the Habers' consumer credit reports without

statutory authorization and then basing their denial of the Habers' opportunity to participate in a

cooperative short-sale-in-lieu-of-foreclosure program ("short sale program") on the information

in those reports. The Habers also claim that BOA and REDC violated the FDCPA by sending

them misleading letters regarding their mortgage and a potential opportunity to participate in the

short sale program.

BOA and REDC separately have moved to dismiss (Docket Nos. 14 & 15). The Court

will grant in part and deny in part both Motions.

## I.     BACKGROUND

Joseph and Gina Haber purchased their home in 2005 and entered into a mortgage agreement. "During all times relevant to this action," the Habers assert, their "mortgage loan was serviced by Bank of America." Compl. ¶ 51 (Docket No. 1). In December 2010, BOA and the Habers entered into a permanent mortgage modification. Compl. ¶ 52. On January 13, 2013, the Habers received a letter ("Solicitation Letter"), on BOA letterhead, that stated it was from REDC on behalf of BOA. The Solicitation Letter explained that REDC "would like to help [the Habers] prevent the upcoming foreclosure on" the Habers' property by offering to discuss the possibility of the Habers' participation in a "cooperative short sale program." Solicitation Letter, Compl. Ex. A. Mrs. Haber then allegedly called REDC and spoke with representative Alonzo Robinson, who is identified specifically by name in the Solicitation Letter. During this phone conversation, the Habers aver, Mrs. Haber told Mr. Robinson that "she and her husband were current on their payments under the Modification and could not understand why Bank of America and REDC were suggesting that they were in imminent risk of foreclosure, such as to warrant a short sale." Compl. ¶ 54.

After this conversation, on January 24, 2013, the Habers received another letter ("Decline Letter"), also on a BOA letterhead. The Decline Letter notified the Habers that "we are unable to offer you a cooperative short sale" because "your loan is not eligible for a Cooperative Short Sale Program at this time because after being offered a Cooperative Short Sale you notified us on January 23, 2013 that you did not wish to participate in the program."  Decline Letter, Compl. Ex B.

2

Then the Decline Letter, apparently (at least, in BOA and REDC's view) because of an employee's failure to delete instructions from a template from which the Letter was created, went on to state that "our credit decision was based in whole or in part on information in a report from the consumer reporting agencies listed below."[1] Decline Letter. This statement is the basis for the Habers' claim in Count I of the Complaint that BOA and REDC violated the FRCA because they obtained the Habers' (and putative class members') credit reports without initiation, authorization, or a firm offer of credit, in violation of 15 U.S.C. § 1681b. *See* Compl. ¶¶ 73–84. Additionally, the Habers claim in Count II that BOA and REDC violated the FCRA because they did not include in the Decline Letter "notification information which would allow Plaintiffs to request the nature of the information obtained by Defendants from third parties or affiliates which was the basis for the denial of Plaintiffs and Class members for participation in the cooperative short sale program," in violation of 15 U.S.C. § 1681m(b) and (d). *See* Compl. ¶ 92; *see also id.* ¶¶ 10, 85–95.

Additionally, in Count III, the Habers plead specific violations of the FDCPA, namely, 15 U.S.C. §§ 1962e and 1692f, for misleading and deceptive communications by a "debt collector." Bank of America and REDC, in moving to dismiss, each argue that they do not meet the statutory definition of "debt collectors" under 15 U.S.C. § 1692a(6).

## II.     STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to 'give the

---

[1] *See also infra* note 3 and accompanying text.

3

defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *id.*

To survive a motion to dismiss, the plaintiff's complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (citation and internal quotation marks omitted). Thus, assessment of the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). The Court must also accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to

the nonmoving party. *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). But that admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (citations and internal quotation marks omitted), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions" (citations omitted)). Finally, "if a [claim] is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

## III.    DISCUSSION

For the following reasons, the Court will deny BOA's and REDC's Motions to Dismiss with respect to Count I (unlawful obtainment of consumer reports under the FCRA) and Count III (violation of the FDCPA), because the Court finds that the Habers have plausibly stated that BOA and/or REDC "pulled" their consumer reports and that BOA and REDC are "debt collectors." But the Court will grant BOA's and REDC's Motions to Dismiss with respect to Count II, because the Habers have not plausibly alleged that either Defendant took "adverse action" against them based on their consumer reports.

A.      **Fair Credit Reporting Act Claims**

BOA and REDC both claim that language in the Decline Letter upon which the Habers

rely was included "based entirely on clerical errors . . . that do not plausibly suggest that there

ever was a consumer report, let alone that [BOA] obtained [their] consumer report." BOA Mot.

5; *see* REDC Mot. 3-6. The Court disagrees.

The FCRA applies predominantly to statutorily-defined credit reporting agencies, but it

also "imposes civil liability on '[a]ny person who . . . fails to comply with any requirement

imposed' by the statute." *Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241, 246-47 (3d Cir. 2012)

(quoting 15 U.S.C. §§ 1681n, 1681o). Negligent violation of any requirement results in liability

in the amount of actual damages; willful noncompliance subjects the violator to either actual or

statutory damages. *Id.* (citing 15 U.S.C. §§ 1681o(a)(1), 1681n(a)).

1.      **Violation of 15 U.S.C. § 1681b for Unauthorized Obtainment of Consumer Reports (Count I)**

In Count I, the Habers claim that BOA and REDC violated the FCRA because they

"willfully obtain[ed] a consumer report for a purpose that is not authorized by the FCRA,"

*Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) (citing 15 U.S.C. §§ 1681b(f),

1681n(a)). Subsection 1681b(f) states that "[a] person shall not use or obtain a consumer report

for any purpose unless," among other things, "the consumer report is obtained for a purpose for

which the consumer report is authorized to be furnished." 15 U.S.C. § 1681b(f)(1). Section

1681b further provides such authorization "in connection with any credit or insurance transaction

that is not initiated by the consumer only if" either "the consumer authorizes the agency to

provide such report to such person," *id.* § 1681b(c)(1)(A), or "the transaction consists of a firm

offer of credit or insurance" and complies with other specific requirements, *id.*

§ 1681b(c)(1)(B)(i)–(iv). Because the Habers did not initiate the offer to discuss participation in the short sale program, neither BOA or REDC had the Habers' authorization to obtain the Habers' reports, and the transaction did not consist of a firm offer of credit because "whether Defendants ultimately approved Plaintiffs and Class members for cooperative short sales was entirely dependent on the actions of third parties, specifically potential buyers of Plaintiffs and Class members' homes, loan investors, and lien holders." Compl. ¶ 81.

BOA and REDC claim that the Court cannot credit the Habers' conclusory allegation that either pulled the Habers' (or putative class members') consumer reports because, in REDC's words, the Complaint "claims that the Habers' mortgage was not in default at the time they received the Solicitation Letter," and thus "undermines Count I." REDC Mot. 4.

> It defies logic to claim that [the Habers'] receipt of the Solicitation Letter was based upon REDC's review of their consumer credit report which, according to Plaintiffs themselves, would report that [the Habers'] mortgage payments were current and they were in no danger of foreclosure. Indeed, the fact that [the Habers] received the Solicitation Letter renders it implausible that REDC accessed their credit report before mailing the Letter, given the status of their mortgage. Their allegation that REDC retrieved their credit reports is completely unsupported, and the few facts contained in the Complaint render [the Habers'] unsubstantiated claim that the Solicitation Letters were mailed following a review of consumer credit reports little more than speculative. Count I thus fails to meet the requisite pleading standard, in that it fails to allege a plausible claim for relief.

REDC Mot. 4-5. BOA takes much the same dim view of the Habers' Complaint and contends that "the Complaint does not plausibly suggest that the Bank ever actually obtained [the Habers'] consumer reports," because the "only . . . reasonable inference [that] can be drawn [is] that the Bank sent Plaintiffs the Decline Letter because they informed a REDC representative that they did not wish to participate in the short sale program." BOA Mot. 5-6.

While the Court finds these contentions sufficiently persuasive to warrant dismissal of Count II, as discussed below, the arguments are fundamentally flawed with respect to the requirements of §§ 1681b and 1681n. All that the Habers must plead under Count I, as outlined

above, is that BOA or REDC pulled their consumer reports without authorization, and not that either actually did anything with those reports. Moreover, the Defendants' premises are faulty. For one, REDC's claim that "[i]t defies logic to claim that [the Habers'] receipt of the Solicitation Letter was based upon REDC's review of their consumer credit report which, according to Plaintiffs themselves, would report that [the Habers'] mortgage payments were current and they were in no danger of foreclosure," is unconvincing because it supposes that either Defendant actually knew of the status (default or current) of the debt—and the Defendants' theory is premised on the contention that, notwithstanding the fact that they told the Habers, in the Letters, that their mortgage was in danger of foreclosure, that just could not be so, so there would be no reason to pull the Habers' consumer reports. Of course, all this starts to sound like a dispute of fact, and resolving those is not the task of a court at the motion to dismiss stage. If the Defendants want to proffer another version of what happened, then, as the Court repeatedly commented at the initial pretrial conference, they are free to partially answer the Complaint and provide competent documentary evidence that they never pulled the Habers' (or putative class members') consumer reports.[2]

Second, the motion to dismiss standard requires that the Court draw all reasonable inferences in favor of the plaintiff. Under Count I, the Habers do not need to allege that either BOA or REDC based their decisions in connection with sending either Letter on the Habers' consumer reports, although such allegations would certainly lend credibility to the Habers' position. But what the parties and the Court should not lose sight of here is the fact that, even if the text generated in the Decline Letter was the result of a template that offers the issuer of a

---

[2] Indeed, from information provided during oral argument, it appears that at least part of this suggestion has been followed in terms of the parties' sharing information as to whether BOA ever did pull the reports. This information will, of course, figure into the Court's analysis of the case in the future, even if it is inappropriate for consideration at the motion to dismiss stage.

letter certain options of what to include in the text, the very existence of a template with such provisions reasonably suggests that BOA's and/or REDC's *modus operandi* is (or was) sending out Solicitation Letters to mortgagors whose mortgages they believe are in default, and, simultaneously, pulling those mortgagors' consumer credit reports to get a better understanding of the situation.[3] Furthermore, BOA and REDC's best case scenario appears to be that not only was the Habers' mortgage not actually in default (and, hence, the Solicitation Letter was entirely in error), but also that the Decline Letter also contained entirely erroneous statements, which, remarkably, took up the majority of the Letter. Despite, by their own account, being 0 for 2, BOA and REDC ask the Court to infer that, in fact, they did not pull the Habers' consumer reports. The proper place to take up that contention is, again, in their forthcoming Answers, in which they can claim that their computers (or employees) did not go on such a frolic and detour.[4] In other words, the fact that the Letters' handling of the short sale program may have been the result of a short circuit program within their computers and human resources—as BOA and

---

[3] The relevant language in the Decline Letter states:

> USE ONLY IF THE DENIAL WAS BASED IN WHOLE OR IN PART ON INFORMATION FROM A CREDIT REPORTING AGENCY
>
> Our credit decision was based in whole or in part on information in a report from the consumer reporting agencies listed below. While the information was provided by these agencies, these agencies played no part in our decision and are unable to supply specific reasons for our decision. You have a right under the Fair Credit Reporting Act to obtain a copy of your credit report from the agencies below. The report will be free if you request it within 60 days after you receive this notice. You also have the right to dispute with the agencies below the accuracy or completeness of any information in your report.

Decline Letter. Combined with the listing of the names and addresses of the three major credit reporting agencies, this passage takes up significant space on the front page of the Decline Letter.

[4] Additionally, the Court declines to take up the willfulness issue at this early stage of the litigation. *See generally* 15 U.S.C. § 1681n; *Fuges*, 707 F.3d at 248-54 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)).

REDC contend—does not mean that the Court can accept the Defendants' characterization of the Letters' language as resulting from a clerical error. The question is one of disputed fact, and, as Mr. Axler pointed out at oral argument on June 25, 2014, BOA and RED's argument asks the Court to accept certain statements in Letters concededly "almost totally inaccurate," despite the fact that, at the motion to dismiss stage, all reasonable inferences are to be drawn in *the Habers'* favor.

### 2.   Violation of 15 U.S.C. § 1681m for "Adverse Actions" Based on Consumer Reports (Count II)

But if the Habers are entitled at this stage of the litigation to the inference that BOA and/or REDC may have pulled their consumer reports, they have not plausibly alleged that either Defendant took any "adverse action(s)" against them—a necessary element for the FCRA's triggering of certain requirements for those who took such action. *See generally* 15 U.S.C. § 1681m. The problem with the Habers' position is that they have pleaded that "Mrs. Haber told Mr. Robinson that she and her husband were current on their payments under the Modification and could not understand why Bank of America and REDC were suggesting that they were in imminent risk of foreclosure, such as to warrant a short sale." Compl. ¶ 54.

Despite Mr. Axler's observation at oral argument that the Plaintiffs nowhere alleged that they asked to be removed from the program, the Court cannot reasonably infer from the Habers' allegations, or from the statement in the Decline Letter that "you notified us on January 23, 2013"—the date of the phone call between Mrs. Haber and Mr. Robinson—"that you did not wish to participate in the [short sale] program," Decline Letter, that either of the Defendants took "any adverse action based in whole or in part on any information contained in a consumer report," 15 U.S.C. § 1681m(a). An employment dispute is an apt analogy: If an employee quits his job because he no longer wishes to do it, then he cannot plausibly claim that the employer

terminated him for an unlawful reason (constructive discharge cases excepted). In other words, after the Habers declined to participate in the program, in one way or another, neither BOA nor REDC had to keep the offer open. This sequence of events leaves no opening for designating some conduct of either or both Defendants as an "adverse action."

Of course, if the Habers wish to be more specific in an amended complaint so as to specifically state that—as they argue in their briefs—they never alleged (presumably because Mrs. Haber never actually said) that they did not wish to participate in the program, they may do so. (And if the Habers cannot meet the pleading standard, then it may well be that they will be unable to represent a class, especially one pleaded on information and belief, either.) Count II will therefore be dismissed without prejudice.

### B.       Fair Debt Collection Practice Act Claims

BOA and REDC claim that they were not acting as "debt collectors" as defined by the FDCPA. Because "[t]he FDCPA's provisions generally apply only to 'debt collectors,'" *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403 (3d Cir. 2000), this contention, if true, would require dismissal of Count III of the Habers' Complaint. *See also* 15 U.S.C. § 1692a(6) (defining "debt collector"); 15 U.S.C. § 1692c (" . . . a debt collector may not . . ."); 15 U.S.C. §§ 1692d–1692f ("A debt collector may not . . .").

### 1.       General FDCPA Principles

A "debt collector" is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted *to be owed or due another*." 15 U.S.C § 1692a(6) (emphasis added). Thus, because they collect debts

11

due to themselves, "[c]reditors—as opposed to 'debt collectors'—generally are not subject to the FDCPA." *Pollice*, 225 F.3d at 403; *see also* 15 U.S.C. § 1692a(4) ("The term 'creditor' means any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.").

To distinguish between "debt collectors," on the one hand, and creditors and mortgage servicers, for instance, on the other, the FDCPA focuses on the nature of the debt at the time it was acquired by the entity dealing with it and the debtor. "[A]n assignee of an obligation is not a 'debt collector' if the obligation is not in default at the time of the assignment; conversely, an assignee may be deemed a 'debt collector' if the obligation is already in default when it is assigned." *Pollice*, 225 F.3d at 403.[5]

These rules follow from the FDCPA's general requirement that the entity to be charged as a "debt collector" "collect[] or attempt[] to collect . . . debts owed or due or asserted to be owed or due another," 15 U.S.C. § 1692a(6), and the exclusion from the definition of "debt collector" of "[a]ny person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (ii) concerns a debt which was originated by such person[ or] (iii) concerns a debt which was not in default at the time it was obtained by such person," *id.* § 1692a(6)(F)(ii), (iii). Thus, a mortgage servicer, whether servicing debt belonging to itself or a different creditor, is not a "debt collector" under the FDCPA unless the

---

[5] *Accord, e.g.*, *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003) ("[F]or debts that do not originate with the one attempting collection, but are acquired from another, the collection activity related to that debt could logically fall into either [the 'creditor' or the 'debt collector'] category. If the one who acquired the debt continues to service it, it is acting much like the original creditor that created the debt. On the other hand, if it simply acquires the debt for collection, it is acting more like a debt collector. To distinguish between these two possibilities, the Act uses the status of the debt at the time of the assignment.").

mortgage was already in default at the time the mortgage servicing company began servicing the loan. *E.g.*, *Jones v. Select Portfolio Servicing, Inc.*, No. 08-972, 2008 WL 1820935, at *7 (E.D. Pa. Apr. 22, 2008).

### a. Whether communications regarding a short sale program constitute "debt collection"

REDC, apparently refusing simultaneously to read the FDCPA and exercise common sense, argues it is not a debt collector because an offer of a short sale program is not "debt collection activity." Although the FDCPA, while casting its regulations primarily with regard to of "debt collection," does not specifically define what conduct constitutes this activity, the Sixth Circuit Court of Appeals' careful guidance in *Glazer v. Chase Home Finance LLC*, 704 F.3d 453 (6th Cir. 2013), persuasively establishes, consistent with Third Circuit precedent, that mortgage foreclosure is debt collection for the purposes of the FDCPA. *See id.* at 463. Concluding that "if a purpose of an activity taken in relation to a debt is to 'obtain payment' of the debt, the activity is properly considered debt collection," the court in *Glazer* held that a lawyer who initiated foreclosure proceedings was liable as a debt collector under the FCDPA, despite the fact that he was not trying to collect the balance of a debt. *Id.* Because "*every* mortgage foreclosure, judicial or otherwise, is undertaken for the very purpose of obtaining payment on the underlying debt, either by persuasion (*i.e.*, forcing a settlement) or compulsion (*i.e.*, obtaining a judgment of foreclosure, selling the home at auction, and applying the proceeds from the sale to pay down the outstanding debt)," these activities are "properly considered debt collection." *Id.* at 461.[6]

---

[6] And, indeed, the FDCPA's substantive provisions indicate that debt collection is performed through either "communication," 15 U.S.C. § 1692c, "conduct," *id.* § 1692d, or "means," *id.* §§ 1692e, 1692f. These broad words suggest a correspondingly broad view of what the Act considers to be "debt collection." *Glazer*, 704 F.3d at 461.

The Third Circuit Court of Appeals embraces a broad definition of "debt collection" consistent with the Sixth Circuit Court of Appeals' definition in *Glazer*. In fact, in *Glazer*, the Sixth Circuit Court of Appeals approvingly refracted the reasoning and standard discussed in the Third Circuit Court of Appeals' decision in *Piper v. Portnoff Law Associates, Ltd.*, 396 F.3d 227 (3d Cir. 2005). *See Glazer*, 704 F.3d at 462-64. In *Piper*, a defendant law firm acted as a debt collector for purposes of the FDCPA when it mailed multiple letters and made phone calls to the plaintiff demanding that she pay her outstanding utility bills. *Piper*, 396 F.3d at 230. After the plaintiff failed to pay, a lien was placed on her home, *id.*, and lawyers later obtained a judgment against her in an *in rem* action and then sought to satisfy that judgment by foreclosing on her home. *Id.* at 231. The court held that these communications constituted "debt collection" under the FDCPA, and noted that using a lien to secure the plaintiff's debt did "not change its character as a debt or turn [the] communications to the [plaintiff] into something other than an effort to collect that debt." *Id.* at 234.  The mere fact that the defendants chose to proceed *in rem* rather than *in personam* did not alter the defendant's status as a debt collector under the FDCPA. *Id.*

This Court is of the view that, if presented with facts like *Glazer*'s, the Third Circuit Court of Appeals would reach the same conclusion on substantially similar reasoning. Accordingly, the Court holds that, under the standards laid out in *Piper* and *Glazer*, the Defendants' stated offer here to discuss the possibility of the Habers' participation in a short sale program to help prevent an "upcoming foreclosure" constitutes "debt collection" for purposes of the FDCPA. Such communication, like those in *Piper*, was, *by its own terms*, made in the course of preparation for and in contemplation of action in pursuit of foreclosure. In fact, even after the Habers declined to participate in the short sale program, the subsequent Decline Letter stated that Bank of America would still like to speak to the Plaintiffs about a "Mortgage Release" in order

to avoid foreclosure. Decline Letter; Compl. ¶ 46. The language of these Letters thus indicates that they were sent for the "very purpose of obtaining payment on the underlying debt, either by persuasion . . . or compulsion," and so are properly considered debt collection activity. *Glazer*, 704 F.3d at 461. This conclusion is consistent with the explicit language in the FDCPA that a "debt collector" is "any person who," inter alia, "collects or attempts to collect, directly *or indirectly*, debts owed or due or asserted to be owed or due another," 15 U.S.C. § 1692a(6), for the offer of participation in a short sale program under the threat of foreclosure is, at best, simply an attempt to do indirectly what a "debt collector" cannot do "directly or indirectly."[7]

### b.     The reach of 15 U.S.C. § 1692f(6)'s regulation of those who "effect dispossession or disablement of property"

The FDCPA's definition of "debt collector" also states that, "[f]or the purpose of section 1692f(6) . . . , [the] term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests." 15 U.S.C. § 1692a(6). Subsection 1692f(6), in turn, penalizes the "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if," among other things, "there is no present right to possession of the property claimed as collateral through an enforceable security interest." *Id.* § 1692f(6)(A). But what *Glazer* and *Piper* make

---

[7] At oral argument on June 25, 2014, REDC renewed its contention that the short sale program is not debt collection, but rather merely an "informational release." As the discussion below makes clear, however, the Habers have adequately alleged that REDC "obtained" the mortgage loans while they were (at least from BOA's or REDC's perspective) in "default." 15 U.S.C. § 1692a(6)(F)(iii). The Court therefore reasonably infers, based on the well-pleaded allegations in the Habers' Complaint—which the Court must accept as true—that REDC's (or BOA's) purpose was to secure repayment of the loans secured by the mortgages (hence the statement in the Solicitation Letter that "[i]n a cooperative short sale, you list the property for sale at the fair market value and, when the property has sold, *your mortgage is paid off* with the proceeds even if you sell your property for less than you owe on the loan," Solicitation Letter (emphasis added) (the fact that this statement may be misleading in that the mortgagor may still have to repay the mortgage *loan* is another matter, perhaps to be taken up later in this litigation)). *See also infra* subsection III.B.3.

clear is that § 1692f(6), in "operat[ing] to include certain [additional] persons under the [FDCPA] for a limited purpose[]," "applies only to repossessors," *Glazer*, 704 F.3d at 463-64, viz., those "people who engage in the business of repossessing property, [but] whose business does not primarily involve communicating with debtors in an effort to secure payment of debts," *Piper*, 396 F.3d at 236—those people, that is, who change the locks. *See Glazer*, 704 F.3d at 464 ("A lawyer principally engaged in mortgage foreclosure does not meet [the] criteria [of § 1692f(6)], for he must communicate with the debtor regarding the debt during the foreclosure proceedings, regardless of whether the proceedings are judicial or non-judicial in nature. Not so for repossessors, who typically 'enforce' a security interest—i.e., repossess or disable property— when the debtor is not present, in order to keep the peace." (citations omitted)).

The Court must therefore also reject the Habers' contention that BOA and REDC are debt collectors under § 1692f(6) because they "threaten[ed] or initiate[d] foreclosure [when] there [was] no present right to do so," Resp. to REDC 12 (Docket No. 22); *see also* Resp. to BOA 13-15, because the Habers have not plausibly alleged that either BOA or RED is, in fact, a repossessor as understood under *Piper* and *Glazer*.

### 2.    Bank of America's Status Under the FDCPA

The Habers contend that BOA is a debt collector because, "[f]or purposes of establishing 'debt collector' status under the FDCPA, the issue of whether Plaintiffs' loan was in default at the time Bank of America began servicing it must be determined by reference to Bank of America's records, not Plaintiffs' contentions that they were current in their payments." Resp. to BOA 8 (Docket No. 21). This contention may be a correct statement of the law,[8] but the Court

---

[8] Although the Habers cite *Prince v. NCO Financial Services*, *Inc.,* 346 F. Supp. 2d 744, 747-49 (E.D. Pa. 2004), even *Prince*, at least according to the court in *Magee v. AllianceOne, Ltd.*, 487 F. Supp. 2d 1024 (S.D. Ind. 2007), may set a standard too forgiving of debt collectors. *Magee*, 487 F. Supp. 2d at 1027. The *Magee* court

disagrees with the Habers that their "allegations, including the Solicitation and Decline Letters, plausibly state that Bank of America believed itself to be a debt collector with respect to their loan, *i.e.* that Bank of America had obtained servicing of the loan while it was in default," Resp. to BOA 11.

The Habers' Complaint lends insufficient support to this theory. The Court has parsed the Habers' Complaint and deemed the following allegations, with the Court's accompanying analysis, relevant to the status of the Habers' mortgage when Bank of America "obtained" the servicing rights, 15 U.S.C. § 1692a(6)(F)(iii):

- The Habers "purchased their home in 2005 and entered into a mortgage agreement." Compl. ¶ 50. (With whom?)

- "During all times relevant to this action, [the Habers'] mortgage loan was serviced by Bank of America." Compl. ¶ 51. Then did BOA "originate[]," 15 U.S.C. § 1692a(6)(F)(ii), the debt? The corollary of this allegation is that at no time relevant to the action did any other entity service the mortgage.

- "In or around September 2010, Bank of America tendered a permanent mortgage modification . . . to the Habers, which: (a) was effective on or about December 1, 2010; (b) the Habers accepted; and (c) the Habers are current on [] their payments." Compl. ¶ 52.

---

disagree[d] with [cases] in which the applicable agreement leaves it to the discretion of the creditor whether to declare default. The express purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). This purpose would be contravened if a creditor were unilaterally able to determine when and if an account was in default for FDCPA purposes and therefore whether the provisions of the FDCPA applied to the debt collection activities of the collection agency it hires. . . .

*Magee*, 487 F. Supp. 2d at 1027-28. In any case, the Court agrees that unless the Habers are explicitly conceding that either of the Defendants thought their mortgage was in default, they have not conceded the issue of default under the FDCPA solely because they maintain that their mortgage has not been in default.

- The Habers did not receive the Solicitation or Decline Letters from which they ask this Court to draw inferences until *January 2013*. Compl. ¶¶ 53–55.

- And, last, the Complaint alleges, with reference to the putative class, that "Bank of America sent the Solicitation and Decline Letters to Class members whose mortgage loan accounts were in default when the servicing rights thereto were acquired by Bank of America, thus making Bank of America a debt collector within the meaning of 15 U.S.C. § 1692a(6)." Compl. ¶ 99(b). This allegation is wholly conclusory.

While it is possible that the Habers' mortgage was in default, so far as BOA was concerned, when BOA "obtained" the mortgage, the Habers never make that allegation. The Court need not decide at this juncture whether that is because they *cannot*, as BOA contends, based on allegations the Habers have made in an unrelated case. Instead, it is sufficient to dismiss this theory on the grounds that the Habers' allegations do not establish whether Bank of America originated the mortgage, acquired it when the Habers' payments were current, or acquired it when the Habers were in default from BOA's point of view. The Letters, sent, as the Habers' own allegations establish, two years after the Habers' mortgage modification with BOA, say nothing that would suggest that the Habers' mortgage was in default two years *before* the Letters were sent. The Court can draw no reasonable inference that the Habers' mortgage was in default when Bank of America began servicing it, presumably in December 2010. Moreover, the Habers presumably know who originated their mortgage and whether Bank of America likely thought the mortgage in default when it acquired the mortgage, if it acquired (and did not originate) it, but they are not saying. *See also, e.g.*, *Roth v. CitiMortgage Inc.*, No. 13-3839, --- F.3d ----, 2014 WL 2853549, at *4 (2d Cir. June 24, 2014) ("[T]he amended complaint does not allege that CitiMortgage acquired Roth's debt after it was in default and so fails to plausibly allege that CitiMortgage qualifies as a debt collector under FDCPA."); *cf. Associated Gen.*

*Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged.").

Rule 12(b)(6) requires plausibility, not mere speculation. The Court declines the Habers' invitation to speculate here that BOA thought that the Habers' mortgage was in default when BOA acquired it, based on no more, apparently, than the Habers' "information and belief," that "[t]he Solicitation and Decline Letters [were] sent . . . to thousands of homeowners nationwide." Compl. ¶ 34; *see also* Compl. ¶ 57. Perhaps there are individuals who received the Solicitation Decline Letters and whose mortgages were acquired, while in default, by Bank of America. But as they have pleaded their Complaint at this point, the Habers are not, and cannot represent, such people. In sum, the Habers have not pleaded that Bank of America is a debt collector not excluded under 15 U.S.C. § 1692a(6)(F)(iii).[9]

The Habers have pointed to an exception to the exception, however: "Notwithstanding the exclusion provided by clause (F)"—that is, the exclusion of debts acquired while not in default—the term "debt collector" "includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). "This provision of the statute is a departure from the general rule that creditors are not subject to the FDCPA." *Vincent v. The Money Store*, 736 F.3d 88, 97 (2d Cir. 2013). The Habers argue that BOA is a debt

---

[9] For similar reasons, the Court rejects the Habers' derivative theory that "Bank of America is estopped from denying that it is a debt collector here because all of its actions demonstrate that it believed it was a debt collector with respect to the Habers' loan, *i.e.* that it began servicing the loan while in default." Resp. to BOA 8, 12-13. This theory appears to be based on the premise that Bank of America "believed . . . that the loan was in default when [it was] acquired." Resp. to BOA 12. But, again, neither Letter establishes that BOA thought the mortgage was in default when BOA acquired it; rather, the Letters merely suggest that BOA thought, around the time it sent the Letters at least two years later, that the mortgage was in default. *See also generally Prince v. NCO Fin. Servs., Inc.*, 346 F. Supp. 2d 744, 751 (E.D. Pa. 2004) (rejecting plaintiff's estoppel argument).

collector under the FDCPA because it used REDC's name in the process of collecting the Haber's mortgage debt. BOA, on the other hand, contends that this statutory language applies only to creditors that use deception to indicate falsely that a third-party debt collector is involved, and that this "false name exception" does not apply here, based on the allegations in the Habers' Complaint.

Although the Third Circuit Court of Appeals has not yet addressed this clause in § 1692a(6), this Court agrees that the FDCPA "does not prohibit a creditor from indicating that a debt collector is attempting to collect a debt on behalf of the creditor. Rather, the FDCPA forbids a creditor from attempting to collect its own debt by falsely representing that the debt is being collected by another entity." *E.g.*, *Brignola v. Home Props., L.P.*, No. 10-3884, 2013 WL 1795336, at *6 (E.D. Pa. Apr. 26, 2013). But what "falsely" means is a question in its own right.

The decisions of other courts of appeals, even though rendered at the summary judgment stage, are instructive because, to the extent they are persuasive, they articulate what elements plaintiffs, like the Habers, must plead (by factual allegation or reasonable inference) to survive past the motion to dismiss stage.

In *Vincent v. The Money Store*, 736 F.3d 88, the Second Circuit Court of Appeals engaged in an exhaustive analysis of the FDCPA's false name exception and laid out three requirements: "(1) the creditor is collecting its own debts; (2) the creditor 'uses' a name other than its own; and (3) the creditor's use of that name falsely indicates that a third person is 'collecting or attempting to collect' the debts that the creditor is collecting," at least as far as the "least sophisticated consumer" would understand. *Id.* at 97-98. The *Vincent* court extensively examined the necessity of, and approaches for, determining "whether the creditor has 'used' a

name, and the role of the third party, *i.e.*, whether the third party is 'collecting or attempt to collect' the creditor's debts." *Id.* at 98. The court explained that

> [b]y requiring the creditor to "use" or "employ for some purpose" a name other than its own, the text of the statute is clear that there must be some active involvement in the misrepresentation by the creditor before triggering liability under the false name exception. The exception does not create backdoor vicarious liability for creditors simply because the collection agencies they hire to collect their debts engage in deceptive practices.

*Id.* at 99. Hiring a "third party for the purpose of sending letters that represent that the third party is collecting the debts . . . is sufficient to show the 'use' of a name by the creditor other than its own." *Id.*

The question then becomes whether there was a misrepresentation as to which entity "was collecting or attempting to collect" the debt. *Id.* at 100. But to "collect," the *Vincent* court explained, "is ultimately ambiguous as applied to the facts of any particular case. It does not define how involved a debt collector must be before we can fairly say it is gathering money on behalf of the creditor." *Id.* On the facts before it—in which a creditor, The Money Store, had hired a law firm, Moss Codilis, to send out debt collection letters; The Money Store argued that Moss Codilis was collecting the debt; and the plaintiff argued that Moss Codilis was merely slapping its letterhead onto mass-generated letters to be sent as The Money Store unilaterally directed—the court explained the importance of the details, and why the case could not be resolved even at the summary judgment stage. Because "'collecting' debts must mean something more than *any* role, no matter how tangential, in the collection process," if Moss Codilis merely "generat[ed] and mail[ed] the breach letters alone," with, for instance, "precise text" provided by The Money Store, then the letters would "mislead[] consumers." *Id.* at 101.

After surveying the views, which the *Vincent* court considered supportive of its own, of the Federal Trade Commission,[10] the Fifth Circuit Court of Appeals,[11] and the Seventh Circuit Court of Appeals,[12] and noting that, aside from it and the Fifth and Seventh Circuits, "no other federal court of appeals has addressed the scope of the false name exception in a precedential opinion," *Vincent*, 736 F.3d at 102 n.15, the *Vincent* court held

> that, when determining whether a representation to a debtor indicates that a third party is collecting or attempting to collect a creditor's debts, the appropriate inquiry is whether the third party is making *bona fide* attempts to collect the debts of the creditor or whether it is merely operating as a "conduit" for a collection process that the creditor controls. *This is a question of fact.*

*Id.* at 103 (emphasis added). Because it could not determine "at the summary judgment stage" whether "Moss Codilis was engaged in such *bona fide* efforts," because the parties disputed whether Moss Codilis was simply performing an "exercise in mass processing" such that The Money Store could "falsely represent to debtors that debt collection letters were 'from' a law firm that had been retained to collect the delinquent debt," the court held that the district court

---

[10] *See Vincent*, 736 F.3d at 101 ("A creditor violates this section if he uses the name of a collection bureau as a *conduit* for a collection process that the creditor controls in collecting his own accounts. . . . A creditor does not violate this provision where an affiliated (and differently named) debt collector undertakes collection activity, if the debt collector does business separately from the creditor (e.g., where the debt collector in fact has other clients that he treats similarly to the creditor, has his own employees, deals at arms length with the creditor, and controls the process himself)." (quoting FTC, Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50,097, 50,107 (Dec. 13, 1988) (emphasis added))).

[11] *See Vincent*, 736 F.3d at 99-101 (citing *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1235 (5th Cir. 1997)).

[12] *See Vincent*, 736 F.3d at 99-104 (citing *Nielsen v. Dickerson*, 307 F.3d 623, 634-39 (7th Cir. 2002); *Boyd v. Wexler*, 275 F.3d 642, 644 (7th Cir. 2001); *White v. Goodman*, 200 F.3d 1016, 1018-19 (7th Cir. 2000)).

had erred in granting summary judgment in favor of The Money Store. *Id.* at 103-05; *accord,*

*e.g.*, *Nielsen v. Dickerson*, 307 F.3d 623, 639 (7th Cir. 2002).[13]

As the *Vincent* court suggested, the Seventh Circuit Court of Appeals applies a similar

test, and holds that the false name exception "forbid[s] a creditor, in the collection of his debts, to

use a name which suggests the involvement of a third party, unless the third party is participating

in the debt collection, for then there is no deception." *See White v. Goodman*, 200 F.3d 1016,

1018 (7th Cir. 2000) (granting summary judgment upon finding insufficient evidence that a

third-party debt collector acted as a conduit when it collaborated with the creditor and sent letters

---

[13] The court further explained:

> Viewed in this light, the jury could conclude that the letters received by
> plaintiffs appear to be "from" The Money Store in every meaningful sense of the
> word. The Money Store reviewed and maintained possession over its debtors'
> files. According to Nash, Moss Codilis merely received spreadsheets from The
> Money Store containing the information of debtors who The Money Store had
> determined were delinquent, added the debtor's information onto a form letter
> with Moss Codilis letterhead, and mailed the letters. While Nash performed
> minimal reviews of the debtor information provided to her and could request loan
> documents for a "questionable account," her statements suggest that this review
> was limited to purely ministerial tasks like ensuring that The Money Store had
> provided her with complete address information. Indeed, Nash indicated that The
> Money Store typically sent Moss Codilis batches of borrower information that
> "usually exceeded 1000 borrowers," and required Moss Codilis to mail all the
> Breach Letters by the next day.
>
> Notwithstanding its limited involvement, Moss Codilis sent out letters to
> plaintiffs stating that "this law firm" has been "retained" in order to "collect a
> debt for our client." The jury could find that this falsely implied that Moss Codilis
> was attempting to collect The Money Store's debts and would institute legal
> action against debtors on behalf of The Money Store if the debtors did not resolve
> the delinquency. Thereafter, plaintiffs argue that Moss Codilis performed virtually
> no role in the actual debt collection process—besides the essentially ministerial
> tasks of verifying the debt with The Money Store, informing debtors of the
> identity of their creditor, and verifying whether a debtor's debts had been
> discharged in bankruptcy.

*Vincent*, 736 F.3d at 103-04 (citations omitted).

the debtors directly, in addition to handling phone calls with debtors and sending follow-up letters).[14]

The conduit theory inspires the Habers to attempt to part [the] REDC—in its alleged role, according to the Habers, as nothing more than a front for BOA, on the one side, from BOA's contention that REDC did real work on its behalf, on the other—to reach lands in which BOA is a "debt collector." It is impossible to tell at this juncture whether the Habers will make it that far—that is, whether REDC was a debt collector in its own regard, or whether, alternatively and mutually exclusively, it was a conduit for BOA—but they have pointed to sufficient facts to permit them to try. While the appellate guidance discussed above clarified the standard at the summary judgment stage, at the motion to dismiss stage, of course, the plaintiff's factual allegations must merely be enough to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner*, 131 S. Ct. at 1296 (citation and internal quotation marks omitted). Although the facts adduced here are not overwhelming, the Habers' Complaint provides enough in the way of factual allegations to support the *inference* that Bank of America attempted to collect its debt by "falsely representing that the debt is being collected by another entity." *Brignola,* 2013 WL 1795336 at *6.

As the *Vincent* court stated, this question is one of fact, and the Habers have sufficiently raised it. The Solicitation Letter was sent on BOA letterhead, although it purports to be from Alonzo Robinson, a REDC representative. Solicitation Letter; Compl. ¶ 35. The Letter identified REDC as a third-party debt collector that would be working with BOA in order to help the Habers avoid foreclosure. Solicitation Letter; Compl. ¶ 39. Although the phone number provided

---

[14] *See Vincent*, 736 F.3d at 99-101 (citing *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1235 (5th Cir. 1997)).

in the Letter is REDC's, the small print at the bottom of the Letter seems to be written by BOA and refers to the communications between the recipients and "us." Solicitation Letter; Compl. ¶ 101(a). Just who the "us" refers to is unclear because of the intermixing of BOA and REDC in the Letter. And the Decline Letter, also sent on BOA letterhead, makes no mention of REDC, Decline Letter; Compl. ¶ 42, although the toll-free number listed on the second page of the Letter also purports to be that of REDC, Compl. ¶ 102(a). Thus, as the Habers' Complaint alleges, recipients of the Letters are likely to be misled about the respective roles played by REDC and BOA. *Id.* Although the Complaint does not dispute that REDC is an independent business, and, in fact, acknowledges that Mrs. Haber spoke to a putative REDC representative on the phone, Compl. ¶¶ 14, 22, its factual allegations are still sufficient to permit the Habers' Complaint to withstand a motion to dismiss.

Finally, and perhaps most significantly, the errors in this case that BOA and REDC point to in order to rebut the Habers' *FCRA* claims are themselves suggestive of a mass-mailing process that, like the mass-mailing in *Vincent*, further suggests that the mailer itself was merely a conduit doing the creditor's bidding. At oral argument, counsel for BOA urged not so much that *Vincent* does not state the correct standard, but rather that it is inapplicable to this case. *Vincent*, counsel argued, was "an attorney collection case." But the Court fails to discern a determinative distinction between a creditor's raising the threat level of its debt collection efforts by way of its involvement of attorneys or a putatively separate debt collection agency. As the Court observed at oral argument, it is hard to imagine how attorney letterhead is much more intimidating than threats of foreclosure by BOA and/or a debt collection agency working on BOA's behalf. But the more important point is that, if a debt collection agency like REDC is a conduit, then regardless of its actual, physical existence, its involvement (or lack thereof), if BOA "controls almost all

aspects of debt collection," *Daniels v. Baritz*, No. 02-7929, 2003 WL 21027238, at *3 (E.D. Pa.

Apr. 30, 2003) (alteration and citation omitted), is *misleading*—and that, rather than "falsity" per

se (i.e., intentional falsity), is what the FDCPA aims to prevent. Thus, if BOA—and *if* is the key

word, but the Court reminds the parties that this is the motion to dismiss stage—was responsible

for the Letters, then their contents are chargeable to BOA rather than to REDC. Contrary to the

implication of BOA's counsel, there is nothing wrong with hiring a third-party debt collection

agency. The question is what that third-party agency does and, later, whether what they did

violates one of the FDCPA's substantive prohibitions. For these reasons, the Habers have stated

a claim, for purposes of this early stage of litigation, that BOA used REDC's name in a

misleading fashion because it continued to control the collection of the Habers' mortgage. The

fact that the Decline Letter does not mention REDC only reinforces that whether REDC was a

conduit is a question of fact better resolved at later stages of this litigation.

To reiterate, "the mere fact that the third-party whose name is used by the creditor is a

real entity not affiliated with the creditor is not dispositive." *Vincent*, 736 F.3d at 98. While

discovery may shed additional light on the extent to which Bank of America "used" REDC to

create a false belief, it would be premature to dismiss the Habers' Complaint against Bank of

America at this stage.[15] In fact, the "false name" exception might more properly be termed "the

misleading name exception."

---

[15] The Court also notes that, when viewed against this backdrop of carefully considered appellate case law, *Magness v. Walled Lake Credit Bureau, LLC,* No. 12-6586, 2013 WL 1311093 (E.D. Pa. Apr. 1, 2013)—a case factually similar to the instant case—is not such an "outlier," BOA Mot. 10 n.5 (Docket No. 15), in result, after all. In *Magness*, Bank of America sent the plaintiff a package informing her that she was at risk of foreclosure and indicated that it would be working with third-party debt collector, Walled Lake, to collect her debt. *Id.* at *1. While it noted that "discovery may shed additional light on the extent to which BOA 'used' Walled Lake's name and whether BOA created a 'false belief' regarding Walled Lake's role in this matter," the court held, albeit without extensive discussion or citation, that the plaintiff's

3.        REDC's Status Under the FDCPA

Although the Solicitation Letter itself permits the reasonable inference that REDC "obtained" the Habers' mortgage when the mortgage was in default, REDC contends that this inference cannot be made because the Habers reiterated on several occasions that their mortgage payments were current at the time that REDC sent the Solicitation and Decline Letters. But these assertions are not determinative of the status of the Habers' debt.

Because the FDCPA does not provide a definition of "default," some courts within the Third Circuit have looked to the statutory provisions governing, and contractual provisions between, creditors and debtors to determine whether a debt is in default at any given time. *See, e.g., Prince v. NCO Fin. Servs., Inc.*, 346 F. Supp. 2d 744, 748 (E.D. Pa. 2004) (citing cases). Still other courts have stated that, in view of the FDCPA's purpose of "eliminate[ing] abusive debt collection practices by debt collectors," 15 U.S.C. § 1692(e), this standard is sometimes too lenient towards the potential debt collector, *see, e.g., Magee v. AllianceOne, Ltd.*, 487 F. Supp. 2d 1024, 1027-28 (S.D. Ind. 2007); *supra* note 8. But however the standard should be specifically conceptualized, in this Court's view, the relevant question in this case is whether Bank of America (and/or REDC), not the Habers, classified the debt as in "default" at the relevant time. *Prince*, 346 F. Supp. 2d at 748; *see also, e.g., Roberts v. NRA Grp., LLC*, No. 11-2029, 2012 WL 3288076, at *6 (M.D. Pa. Aug. 10, 2012).[16] If the Habers had defaulted, so far as

_____

allegations were "sufficient to state a claim that BOA's actions fall within the FDCPA's purview." *Id*. at *4.

[16] In general, a better view, given the FDCPA's purposes, would be to consider the debt in "default" at the time it was acquired if it could be said to have been in default under either **(a)** a subjective view, because either the transferee or the transferor of the debt believed it was in default at the time of acquisition (following from *Prince*), *or* **(b)** an objective view, *cf., e.g., FTC v. Check Investors, Inc.*, 502 F.3d 159, 172 n.12 (3d Cir. 2007) ("Because the checks Check Investors purchased from Telecheck had already been dishonored, they were in default when purchased.").

27

BOA was concerned, such that BOA then referred their mortgage to REDC for debt collection, then REDC is a debt collector.

The Habers have met this burden at this early stage of the litigation. They have provided sufficient evidence to support the inference that, under Bank of America's own records, their mortgage was in default at the time BOA sought REDC's assistance in servicing their mortgage. The Solicitation Letter itself states that REDC "would like to help you prevent the upcoming foreclosure." Solicitation Letter; Compl. ¶¶ 36, 37. Additionally, the Decline Letter, although noting that the Plaintiffs are not eligible for the short sale program, asserts that Bank of America would still like to speak to the Plaintiffs about a "Mortgage Release" in order to avoid foreclosure. Decline Letter; Compl. ¶ 46. Indeed, the Decline Letter makes numerous references to "help[ing] you avoid foreclosure." Decline Letter; *see also* Compl. ¶ 47. Although the Decline Letter indicates that both Letters were sent to some putative class members who were current on their mortgages, neither Letter attempted to distinguish between recipients who were facing imminent foreclosure and those who were not. Compl. ¶¶ 48, 62.

Perhaps most persuasive, however, is the observation that the Decline Letter states the following, as Mr. Axler pointed out at oral argument:

> If you are current on your mortgage payments, we strongly encourage you to continue making the normal monthly payments required under the original loan documents to help avoid foreclosure. Unfortunately, there is no guarantee that making payments will help you qualify for a program that may resolve your situation, but not making any payments will increase your chance of foreclosure. We want to help you avoid that possibility.
>
> **We want to help you avoid foreclosure. This is an urgent matter requiring your immediate attention, so please call us today . . . .**

Decline Letter (bolding in original). The Court cannot comprehend how REDC can argue that this language does not state, let alone permit the reasonable inference, that REDC and BOA thought the Habers' mortgage was in default.

Based on the content of these Letters, the Court reasonably infers that BOA sought REDC's assistance in collecting the Habers' and putative class members' mortgages through the short sale program because it thought the mortgagor recipients, including the Habers, had defaulted. As alleged, therefore, REDC meets the FDCPA's definition of a "debt collector" under § 1692a(6), and is not excluded from the definition under § 1692a(6)(F)(iii).

## IV.   CONCLUSION

For the foregoing reasons, the Court holds that the Habers have (1) adequately stated a cause of action under Count I for violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681b, for Bank of America and REDC's unlawful pulling of their consumer reports; (2) not plausibly stated a claim under Count II against either BOA or REDC for either Defendant's pursuit of "adverse action(s)" against the Habers under the Fair Credit Reporting Act, 15 U.S.C. § 1681m; and (3) plausibly stated that both Bank of America and REDC are "debt collectors" for the purposes of the Fair Debt Collection Act (although for different reasons). Accordingly, the Court grants in part and denies in part both Motions to Dismiss.

An Order consistent with this Memorandum follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

29